*Tagged Opinion*



**ORDERED in the Southern District of Florida on September 26, 2019.**

_____

**Laurel M. Isicoff**
**Chief United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In Re                                                    Case No. 17-21187-LMI

Brenda Diana Nestor,                                        Chapter 11

      Debtor,

_____/

## MEMORANDUM OPINION ON FEE APPLICATIONS

This cause came before the Court for hearing on January 29, 2019 (the "Fee Application Hearing"), upon the following fee applications: (i) the *Final Application for Allowance and Payment of Compensation and Reimbursement of Expenses to Oppenheim Pilelsky, P.A. as Special Counsel to the Debtor* (ECF #187) (the "Oppenheim Fee Application"), (ii) the *Summary of Final Fee Application of Special Counsel For Chapter 11 Debtor (Beighley, Myrick, Udell & Lynne, PA and Maury Udell, Esq.)* (ECF #709) (the "Udell Fee Application"), (iii) the *Final Fee Application of the Law Firm Lewis & Thomas, LLP, and Agreed Motion to Split Fee Award with Steven Fender PA as its Former Associated Counsel for the Debtor*

1

(ECF #713) (the "L&T Fee Application")[1], (iv) the *Final Fee Application for Compensation and Reimbursement of Expenses of Carin Sorvik, CPA, and Newpoint Advisors Corporation, as Accountant to the Debtor-In-Possession for the Period March 30, 2018 Through December 26, 2018* (ECF #721) (the "Sorvik Fee Application"), and (iv) the *Summary of First and Final Fee Application of John G. Crabtree, Esq. and Crabtree & Auslander, L.L.C.* (ECF #736) (the "Crabtree Fee Application") (collectively the "Fee Applications").[2]

## Facts and Procedural History

Brenda Diana Nestor (the "Debtor") filed this Chapter 11 bankruptcy proceeding on August 31, 2017 (the "Petition Date"). The Fee Applications at issue arise primarily from litigation conducted by estate counsel outside the bankruptcy court. The Debtor served as the personal representative ("PR") and sole residuary beneficiary of the probate estate of Victor Posner[3] (the "Probate Estate"), pending in the circuit court of Miami-Dade County Florida[4] (the "Probate Case"). On April 30, 2015, the probate court removed the Debtor as the

---

[1] Steven Fender PA ("Mr. Fender") and the law firm of Lewis & Thomas, LLP ("L&T") were associated during the time that Mr. Fender represented the Debtor.  Subsequently, Mr. Fender moved to another firm. Mr. Fender and L&T agreed to split the fees in this case – 75% of any time associated with Mr. Fender's work may be claimed by Mr. Fender; the other 25% of time billed by Mr. Fender may be claimed by L&T. Any further reference to the L&T Fee Application relates only to the portion that is *not* claimed by Mr. Fender.

[2] This memorandum opinion will only address the Oppenheim Fee Application, the Udell Fee Application, the L&T Fee Application (other than the portion already approved, relating to the work performed by Mr. Fender), and the Crabtree Fee Application.  Because L&T filed prior fee applications, those will be examined as well, as required by the Bankruptcy Code as part of the final fee approval process. The Court has already approved the Sorvik Fee Application. The Court took under advisement the remaining Fee Applications.

[3] Victor Posner was a Miami real estate developer who died on February 11, 2002 in Miami Dade County.

[4] *In re Estate of Victor Posner* 02-595CP02, Section 6 (11th Judicial Circuit, Miami Dade County, Florida)

PR after finding that the Debtor failed to comply with numerous orders of that court. The probate court appointed Philip Von Kahle to act as curator of the Probate Estate (the "Curator"), replacing the Debtor as the fiduciary of the Probate Estate.

Multiple lawsuits stemmed from the Debtor's former roles as both PR of the Probate Estate and the sole residuary beneficiary of the Probate Estate (collectively the "State Court Litigation"). The Curator sued Fidelity and Deposit Company of Maryland ("F&D"), the insurer who issued the Debtor's PR fidelity bond (the "PR bond"). That suit sought recovery of the financial losses the Probate Estate allegedly suffered due to the Debtor's actions or inactions as PR (the "F&D Litigation"). The F&D Litigation began prior to the Debtor's bankruptcy. Post-petition, the Debtor filed a cross claim (the "Cross Claim") against the Curator in the F&D Litigation. In her role as the sole residuary beneficiary, the Debtor objected, pre-petition, to a settlement between the Curator and the Pension Benefit Guaranty Corporation ("PBGC") which settlement the probate court eventually approved. The Debtor appealed the probate court's approval of that PBGC settlement to Florida's Third District Court of Appeal in the case styled *Brenda Nestor v. The Estate of Victor Posner*, Case No. 3D16-1330 (the "Appeal").

During the Debtor's time as debtor in possession, the Debtor continually failed to comply with this Court's orders. The Debtor did not accurately report her assets and liabilities or file timely, or accurate, monthly operating reports. The Debtor did not fulfill her fiduciary duties as debtor in possession; instead,

she blamed shortcomings on her counsel. After giving the Debtor many opportunities to hire competent counsel and put the case back on track, this Court ultimately entered an *Order Directing Appointment of Chapter 11 Trustee* (ECF #405). The United States Trustee ("UST") appointed Joel L. Tabas as Chapter 11 Trustee (the "Trustee") on May 10, 2018.

A parade of professionals has represented the Debtor throughout this Chapter 11 case. The Debtor has had, to date, three different law firms represent her as the Debtor in Possession and three as Debtor since appointment of the Trustee. Additionally, the Debtor engaged several other professionals (at least one without court authorization) to represent the estate as special counsel. Oppenheim filed its application for employment on October 9, 2017 (ECF #38) (the "Oppenheim Employment Application"), which the Court approved on November 21, 2017, in the *Order Granting Debtor-In Possession's Application for Employment of Roy D. Oppenheim and Oppenheim Law as Special Counsel [DE# 38]* (ECF #87) (the "Oppenheim Retention Order"). Oppenheim served as counsel to the Debtor in the State Court Litigation, during which representation, Oppenheim filed the Cross Claim against the Curator. Oppenheim ultimately moved to withdraw as Debtor's special counsel on December 29, 2017. The Court approved Oppenheim's withdrawal on January 3, 2018.

Udell filed its application for employment on January 19, 2018 (ECF #166), which the Court approved on February 5, 2018 in the *Order Granting Debtor In Possession's Application For Employment of Maury Udell, Esquire and Beighley, Myrick & Udell, P.A., For Employment As Special Counsel [DE#166]* (ECF #211)

(the "Udell Retention Order"). Udell served as counsel to the Debtor in the State Court Litigation after Oppenheim withdrew as counsel. Udell represented the Debtor in the prosecution of the Cross Claim. Udell also filed a lawsuit on behalf of the Debtor against Akerman, LLP in state court on April 4, 2018.

L&T filed its application for employment on October 6, 2017 (ECF #34), which the Court approved on November 8, 2017, in the *Order Approving Employment of Debtor In Possession's Attorney [DE#34]* (ECF #79) (the "L&T Retention Order"). L&T was the second firm to serve as Debtor's counsel in the Chapter 11 main bankruptcy case.

Crabtree filed its application for employment (ECF#149) (the "Crabtree Employment Application") on January 11, 2018, which the Court approved on January 19, 2018 in the *Order Approving Employment of Debtor In Possession's Appellate Attorney [De#149]* (ECF #170) (the "Crabtree Retention Order"). Crabtree served as counsel to the Debtor in the Appellate Case.

The Trustee and two major creditors, F&D and Charles Hoebeke as receiver for Evans Tempcon ("Hoebeke") filed objections to the Fee Applications.[5]

---

[5] *Receiver's Amended (A) Supplemental Response To Motion To Dismiss, and (B) Objection To Final Fee Application Of Debtor's Special Counsel, Oppenheim Pilelsky, P.A.* (ECF #216); *Trustee Tabas's Omnibus Response To Professional Fee Applications Scheduled For Hearing On January 29, 2019* (ECF #747); *Joinder To The Trustee Tabas's Omnibus Objection To The Professional Fee Applications Scheduled For Hearing On January 29, 2019 [Main Case ECF No. 747], And Separate Objection To Application For Final Compensation Filed By Beighley, Myrick, Udell & Lynne, PA [Main Case ECF No. 709]* (ECF #748); and *Receiver's Concurrence With Trustee Tabas' Omnibus Response To Professional Fee Applications Scheduled For Hearing On January 29, 2019 (DE 747)* (ECF #749).

## Legal Analysis

The Bankruptcy Code outlines a strict framework for the retention and compensation of estate professionals. Estate professionals must be retained in accordance with 11 U.S.C. §327, which requires, generally, that the estate professional must be "disinterested," meaning the professional "is not a creditor, an equity security holder, or an insider". 11 U.S.C. §101(14). Consequently, with limited exception, an attorney who has represented the debtor pre-petition cannot represent the bankruptcy estate. Nonetheless, recognizing this restriction may, at times, be counter-productive, section 327(e) authorizes a trustee or debtor in possession to employ "for a specified special purpose" an attorney who has previously represented a debtor "if in the best interests of the estate". Once an estate professional has been retained, his or her paramount obligation is to the estate. *In re South Station, LLC*, 464 B.R. 46, 56 (Bankr.D.Utah 2011). Moreover, any Florida attorney also must comply with all of the requirements of the Rules of Professional Conduct of the Rules Regulating The Florida Bar (the "Ethics Rules"). If, and as, possible conflicts arise, it is the duty of the estate professional to disclose those potential conflicts so that the court and other parties in interest may determine whether the professional is no longer disinterested.  *Id.* at 55; *see* 11 U.S.C. §328(c).

Compensation of estate professionals retained under section 327 is governed by 11 U.S.C. §330 which directs the Court to

> consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –
> (A) the time spent on such services;
> (B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. §330(a)(3). The Federal Rules of Bankruptcy Procedure and this Court's Local Rules[6] require that fee applications provide specific information concerning the services rendered, including details of each time entry, hourly charge, and a description of the person whose time is being charged. However, a court's inquiry does not end there. Section 328(c) of the Bankruptcy Code states that "the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 . . .if, at any time during such professional person's employment under section 327 . . ., such professional person is not a disinterested person . . .."

## The Oppenheim and Udell Fee Applications

The Debtor retained Oppenheim as special counsel to represent her[7] in the F&D Litigation. The Oppenheim Employment Application described the proposed role of Oppenheim as counsel to the Debtor in the then-pending lawsuits of *Philip*

---

[6] Fed.R.Bankr.P. 2016 and Local Rule 2016-1.

[7] As Ms. Nestor was a debtor-in-possession at the time, representation of Ms. Nestor was representation of the bankruptcy estate.

*Von Kahle, Curator vs. Fidelity and Deposit Company of Maryland*, Case Number 2016-21099 CA 40;   *In Re: ESTATE OF VICTOR POSNER,* Case Numbers 2002-000595-CP-02, 2002-002058-CP-02, 2002-003391-CP-02, 2002-003701-CP-02*;* and *Bank of America, N.A. v. Brenda Nestor, et al.* Case Number 2017-019569-CA-01, defined collectively in the application, and in this opinion, as the "State Court Litigation". The Oppenheim Employment Application proposed that Oppenheim's services would include "[d]efend[ing] and prosecut[ing] the Debtor's complex business and real estate litigation cases currently pending in the State Court Litigation." *Id.* at Para. 5.

The Court approved Oppenheim's retention as special counsel at a hearing on October 30, 2017, but the Court did not enter the Oppenheim Retention Order until November 21, 2017. In the interim, Oppenheim filed the Cross Claim in the F&D Litigation on November 15, 2017.[8] Oppenheim's Fee Application seeks fees in the amount of $210,962.70 and an expense reimbursement in the amount of $5,180.20.

Udell picked up where Oppenheim left off, continuing to represent the Debtor in the State Court Litigation. For its role as special counsel, Udell now seeks attorney's fees in the amount of $61,458.00 and an expense reimbursement in the amount of $965.00. Udell's Fee Application only seeks fees through May 11, 2018, because, after his appointment, the Trustee terminated Udell's authority to represent the bankruptcy estate in the State Court Litigation.

---

[8]   The Cross Claim alleged that the Curator committed fraud and civil conspiracy. The Cross Claim further alleged that the Curator breached his fiduciary duty owed to the Probate Estate by performing or failing to perform a variety of acts.

The most significant objections to Oppenheim's employment were raised by Hoebeke in February 2018, when Oppenheim filed the Oppenheim Fee Application. In his objection, Hoebeke pointed out that Oppenheim seeks compensation from August of 2017, despite the fact that the Oppenheim Fee Application did not ask for retention *nunc pro tunc.* More significantly, and more troubling, despite the representations of the Debtor and Oppenheim in the Oppenheim Fee Application regarding disinterestedness, not only had Oppenheim represented the Debtor pre-petition, and, as of the Petition Date was owed money for that representation, Oppenheim received payment *post-petition* on account of that prepetition obligation. None of this was disclosed at any point prior to Oppenheim's motion to withdraw.

Oppenheim contends that the Oppenheim Employment Application made it clear that it was seeking *nunc pro tunc* employment because Oppenheim attached the retainer agreement to the application, and that retainer delineated the employment dates. Oppenheim also argues that its receipt of post-petition payment for pre-petition services is acceptable because the firm received the payment from a third party, not the Debtor directly[9].

Clearly the failure of Oppenheim to disclose that it was NOT disinterested is disqualifying, and the Court *could* deny the Oppenheim Fee Application in full. However, as the Eleventh Circuit pointed out in *Electro-Wire Products, Inc. v. Sirote & Permutt, P.C. (In re Prince),* 40 F.3d 356 (11th Cir. 1994), while 11 U.S.C.

---

[9]  Oppenheim never sought to explain its failure to disclose its prepetition relationship with the Debtor.

§328(c)[10] gives the Court the authority to deny the fees in full, it does not require it. So the Court will turn to the balance of the objections and then circle back to how it will treat the failure of the Debtor and Oppenheim to disclose the lack of disinterestedness and the receipt of funds in violation of the Bankruptcy Code.

The Trustee, Hoebeke and F&D also objected to the Oppenheim and Udell Fee Applications on the basis that

- Oppenheim's filing of the Cross Claim and bringing affirmative claims on behalf of the Debtor in the F&D Litigation were not included in the scope of services described in the Oppenheim Employment Application, and the Oppenheim Employment Application was never amended to authorize that work;

- There was no possibility that the Cross Claim could benefit the bankruptcy estate because the claim was derivative of the Probate Estate and the Debtor had no immediate exposure with respect to the claims being litigated in the F&D Litigation;

Oppenheim responds that the Cross Claim would have benefitted the bankruptcy estate because the Cross Claim reduced potential personal exposure of the Debtor, and therefore, any claim against the bankruptcy estate. Oppenheim further argues that it makes no difference whether the Cross Claim

---

[10] "(c) Except as provided in section 327(c), 327(e), or 1107(b) of this title, the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title if, at any time during such professional person's employment under section 327 or 1103 of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed."

was derivative in nature because the Debtor was the sole residuary beneficiary of the Probate Estate. Any monetary recovery to the Probate Estate would flow down to the Debtor and, thus, to her bankruptcy estate.

Udell responds that the Cross Claim, which Udell continued to pursue after its substitution, had value for the bankruptcy estate because first, the claims alleged carried the *potential* for punitive damages against the Curator and, second, the claims belonged to the Debtor as the sole residuary beneficiary of the Probate Estate.

In addition to the objections the Court previously outlined, the Trustee objects to Udell's fees on two additional grounds. First, the Trustee objects to any fees sought in connection with a lawsuit Udell filed on April 4, 2018 against the law firm of Akerman, LLP in a case styled *Brenda Nestor v. Akerman, LLP,* Case No. 2018-10978-CA-01 in the Circuit Court in Miami-Dade County, Florida alleging breach of fiduciary duty, legal malpractice, and civil conspiracy (the "Akerman Suit"). The Trustee argues that neither the Debtor nor Udell sought court authority prior to filing the Akerman Suit. The Akerman Suit actually exposed the estate to administrative costs; Akerman, LLP threatened to make a claim against the bankruptcy estate for the fees and costs the firm incurred in connection with the Akerman Suit.[11]

Second the Trustee (joined by F&D) argues that Udell breached its

---

[11] The Debtor ultimately dismissed the Akerman Suit on November 1, 2018, as a condition of the bar order included in the Court's *Order Granting Motion to Compromise Controversy with the Victor Posner Probate Estate and Related Parties* (ECF #665).

obligations to the bankruptcy estate[12] by virtue of Udell's representation of the Debtor's husband, Robert Castellano, on whose behalf Udell filed a complaint in the Probate Estate against the Curator (the "Castellano Suit")[13]. The Castellano Suit occurred during a pivotal time when the Trustee was negotiating a settlement with the Curator and Akerman, LLP. The Trustee argues that as a result of the Castellano Suit, the Curator demanded a bar order as a condition of the Curator's settlement with the bankruptcy estate, which increased the Trustee's legal fees and delayed the settlement process. Udell claims that the Castellano Suit, filed after Udell was no longer representing the estate, was neither contrary to the interests of, nor did it harm, the bankruptcy estate.

At the Fee Application Hearing, Udell argued that, in addition to its work on the Cross Claim, the firm brought value to the bankruptcy estate through its advice to the Debtor regarding potential affirmative claims against F&D for breach of duty of good faith to Ms. Nestor, arising from F&D's settlement with the Curator in the F&D Litigation. Though Udell did not ultimately file a claim against F&D for breach of the duty of good faith, Udell argues its advice had value at the time it was given. F&D forcefully responded arguing there is no such thing as an affirmative cause of action for breach of the duty of good faith

---

[12] The Trustee argued that Udell's representation of Mr. Castellano was a violation of the Florida Rules of Professional Responsibility RULE 4-1.9 Conflict of Interest; Former Client because Udell took a position contrary to the bankruptcy estate, at that point, a prior client. Florida Rule of Professional Responsibility 4-1.9 states that "A lawyer who has formerly represented a client in a matter must not afterwards: (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent. . .."

[13] *Robert Castellano v. Philip Von Kahle, et al,* 18-028845-CA-01 (11th Judicial Circuit, Miami Dade County, Florida).

between a bonding company and the fiduciary bonded – rather, any alleged misstep by a bonding company creates a defense to the indemnity - and therefore any legal advice about a non-existent cause of action has no value.

Based on the objections, the Court will not award either Oppenheim or Udell the full amount of fees requested.

"It is consistently held that an attorney is not entitled to any compensation for postpetition services if the employment was not approved by the Court. Court approval of the employment of counsel for a debtor in possession is the sine qua non to counsel getting paid. Failure to obtain court approval of a professional in accordance with § 327 and Rule 2014 precludes the payment of fees." *In re Keller Fin. Servs. of Fla., Inc.,* 248 B.R. 859, 891 (Bankr.M.D.Fla. 2000) (citing *In re Monument Auto Detail, Inc.*, 226 B.R. 219, 224 (9th Cir. BAP 1998)) (finding it appropriate to disgorge more than $1,300,000 in fees paid to debtor's counsel's firm for non-disclosure of compensation for postpetition services). "When considering allowance to a professional, one must initially consider whether the employment was authorized by the court. Clearly if the professional was not authorized to be employed it is not entitled to any compensation. From that it might logically follow that if the failure to disclose the relevant information rendered the authorization invalid, the professional would not be entitled to any compensation at all." *In re Gulf Coast Orthopedic Center*, 265 B.R. 318, 323 (Bankr.M.D.Fla. 2001).

The caselaw is clear that the court has the power to deny and disgorge fees sought by non-disinterested parties when the court finds it warranted. *See*

*Prince,* 40 F.3d at 360 (acknowledging the "permissive nature" of the statutory language in section 328(c) that gives wide discretion to the bankruptcy court to determine the appropriate award of fees, though ultimately ruling in favor of strict application to disgorge based on the facts at hand); *see also In re Howard Avenue Station, L.L.C.,* 568 B.R. 146 (Bankr.M.D.Fla. 2017) ("the court may choose to temper that power [to modify fees awards as compared with the amount requested] with reasonable discretion under the circumstances of the case. Although there is ample authority for a rigid, 'zero-tolerance' approach, this Court adopts a case-by-case approach.").

In *In re Prince,* 40 F.3d 356 the Eleventh Circuit addressed the issue of "whether a law firm's prior representations and continuing connections to a bankruptcy debtor and to other parties in interest causes a conflict of interest which prejudices or harms the debtor's estate to the extent that the firm should be denied fees for its bankruptcy representation of the debtor." *Id.* at 358. The Eleventh Circuit explained that "[l]aw firms, no matter their size, must ensure that their representations do not result in irreconcilable, intolerable conflicts that can only result in harm to their clients". *Id.* at 361. Ultimately the fees in *Prince* were denied in their entirety.

As previously stated, the Court has determined that Oppenheim is entitled to some compensation, but it will be adjusted. First, Oppenheim is not entitled to fees for work performed between August 31, 2017 and October 9, 2017 (the "Unauthorized Time Period"). Oppenheim began work on the State Court Litigation more than two months *before* the Court authorized its retention. When

finally filed, the Oppenheim Employment Application did not request its fees *nunc pro tunc* to the Petition Date. Accordingly, the Court will not compensate Oppenheim for the work done between the Petition Date and October 9, 2017, the date of the Oppenheim Employment Application. Second, Oppenheim will have to credit to any amount awarded all fees that were paid to him post-petition.

Udell is not entitled to payment of any time charged for drafting and filing the Akerman Suit because that lawsuit was not included in the scope of work authorized by the Court. *See e.g., In re Underground Utilities Const. Co., Inc.,* 13 B.R. 735 (Bankr.S.D.Fla. 1981) (bankruptcy court did not award compensation to Chapter 11 special counsel for unauthorized activities). Had Udell sought the Court's authority to file the Akerman Suit, the Court would have denied such a request; the Court has repeatedly addressed the lack of merit of these claims. Udell's filing of the Akerman Suit exposed the bankruptcy estate to administrative claims arising from that lawsuit.[14]

Udell's actions on behalf of Castellano clearly violated Rule 4-1.9. The Castellano Suit was filed in the same probate action in which Udell had represented the estate and, as this Court observed at this hearing on the settlement, over Castellano's objection, the Castellano Suit was virtually identical to the complaint Udell had prosecuted on behalf of the Debtor previously. Moreover, the filing of the Castellano Suit was an action adverse to the interests of the bankruptcy estate as it interfered with the Trustee's

---

[14] Oppenheim also included some time on a potential lawsuit or crossclaim aimed at Akerman and other professionals of the Curator.  All of those fees are disallowed.

settlement efforts.

The Court finds that Udell's position with respect to the Castellano Suit caused harm to the bankruptcy estate in the form of additional attorneys' fees incurred by the Trustee. Udell's actions warrant the Court's imposition of a dollar for dollar setoff against Udell's award for the harm caused. In order to calculate the proper setoff, within 14 days of the entry of this Order the Trustee shall file a schedule of attorneys' fees incurred by the estate relating to the Castellano Suit and Bar Order negotiations.

The Court will allow Udell fees associated with legal advice relating to potential affirmative claims against F&D. The Court has reviewed the post-submission pleadings of Udell and F&D regarding the good faith issue. While the Court agrees with F&D that the case cited by Udell[15] is distinguishable, there are, apparently instances in which an insured may have an affirmative cause of action against a surety for lack of good faith. Consequently, the Court has no basis to find that the venture was so futile as to warrant complete disallowance of the fees associated with the advice.

Oppenheim and Udell are entitled to fees associated with the filing of the Cross Claim. Although the Oppenheim Retention Order does not specifically authorize the filing of the Cross Claim, the parties addressed Oppenheim's intent to bring affirmative claims at the October 30, 2017 hearing on the Oppenheim Employment Application. Fulton Bank is the only creditor that objected at the hearing, and its objection was based on the failure to describe the affirmative

---

[15] *Carles Const., Inc. v. Travelers Cas. & Sur. Co. of Am.,* 56 F. Supp. 3d 1259 (S.D. Fla. 2014).

claims. None of the other parties raised a substantive objection to Oppenheim's filing of affirmative claims on behalf of the bankruptcy estate. The Court concludes that (i) all parties were on notice that Oppenheim (and therefore, its successor Udell) intended to work on a possible cross claim and affirmative defenses in the F&D Litigation and (ii) there was a consensus at the time of Oppenheim's retention that Oppenheim's services would benefit the bankruptcy estate. Thus, while ultimately it was determined that those claims had no value to the estate, at the time of retention of both Oppenheim and Udell, parties in interest believed otherwise, and therefore Oppenheim and Udell are entitled to reasonable compensation for their services (determined under the standards described above), subject to the reductions and setoffs described in this order. The Court will award fees to Oppenheim and Udell for the work done on the State Court Litigation, which encompasses the Cross Claim. Oppenheim and Udell spent significant time working on the State Court Litigation. The Court finds that the hourly rates charged were reasonably for the professionals performing the work. However, the Court finds that with respect to both Oppenheim and Udell, it is appropriate to make certain reductions based on excessive time, over-lawyering, or other issues relating to reasonableness more fully outlined below.

The Oppenheim Fee Application seeks $210,952.70 in fees and $5,180.20 in costs. The Court has determined it is appropriate to reduce the fees by $80,056.80 and the costs by $777.88. In addition to the reasons already described, the Oppenheim fees are reduced for all fees associated with bankruptcy work unrelated to Oppenheim's retention, withdrawal, and payment,

as well as some work related to the Debtor's pension, issues relating to the Debtor's husband, and charges relating to the appeal filed by the Crabtree firm. Oppenheim was not retained to provide any general bankruptcy advice or for these other matters. Further, Oppenheim has some charges for a second partner who appears to have participated in a few conversations about the litigation. There are already allowed charges for the two primary lawyers – Mr. Oppenheim and Ms. Trask. Therefore, the fees for that third lawyer are disallowed. In addition, Oppenheim charged the estate for training relating to litigation support software; those charges are not appropriate. Finally, the Court has disallowed some of the fees for particular tasks (e.g., the drafting of the cross claim) which the Court finds were excessive, as well as some entries that were clearly duplicates. The Court has also disallowed expenses that do not fall within the Court's Guidelines for Fee Applications for Professionals, primarily mileage and meals. The Court therefore awards Oppenheim $130,895.90 in fees and $4,402.32 in costs. These amounts shall be further reduced by the $15,000 paid to Oppenheim post-petition, irrespective of the source of payment.  Thus the Trustee may pay Oppenheim $115,895.90 for fees and $4,402.32 for expenses and Oppenheim may apply its "retainer" of $15,000.  If there are additional funds that were paid to Oppenheim post-petition on account of pre-petition services besides the $15,000 described as the retainer, the Trustee is directed to further reduce payment by those amounts.

The Udell Fee Application seeks $61,458.00 in fees and $965.00 in expenses. The Court has determined it is appropriate to reduce the fees by

$8,728.50, further reduced by the extra fees incurred by the Trustee with respect to the Castellano Suit and the extra work associated with the Bar Order. In addition to the reasons already described, the Court has disallowed fees relating to the Windmill bankruptcy other than those associated with the filing of the cross-claim, and excessive charges for particular tasks.[16] The Court therefore awards Udell $52,729.50 in fees, less whatever amount will be setoff after review of the Trustee's fees and expenses incurred as a result of the Castellano Suit, and $965.00 in expenses.

**The Lewis & Thomas Fee Application**

L&T first appeared in this case to take over for the Debtor's initial counsel shortly after the filing of the chapter 11 bankruptcy petition. L&T remained lead counsel for the Debtor for approximately 7 months. For that work, L&T previously received a net interim fee award of $60,076.50 in fees and $529.16 in costs.[17]

The L&T Fee Application seeks a final award of an additional $162,146.00 in fees (for a total of $222,222.50), $71,396.00 of which would be payable to L&T.[18] In support of its fee application, L&T argues that the firm triaged the

---

[16] The Court also notes that Udell did not comply with the Court's Guidelines for Fee Applications. For example, the Court assumes, but has no way of knowing for sure, that MP is an attorney, presumably an associate at the firm. On that basis the Court finds the hourly rate charged appropriate. However, if MP is a paralegal then the Court may reduce the application further since the maximum appropriate rate for a paralegal would be $150.00 an hour.

[17] On February 22, 2018, the Court entered the *Order Approving First Interim Fee Application for Compensation and First Supplemental Summary to First Interim Fee Application for Compensation for Lewis & Thomas, LLP [DE# 116 & DE# 190]* (ECF #247) (the "First L&T Fee Order"). The First L&T Fee Order required a 40% holdback of fees ($40,051.00) (the "Hold Back Amount").

[18] This amount consists of the Hold Back Amount plus the fees billed by L&T between January 20, 2018 and April 18, 2018. The Court has already awarded $90,750.00 that was attributed solely to the work performed by Mr. Fender. *See supra* n. 1.

chapter 11 case to successfully get control over the many moving pieces involved. L&T noted the difficulty it encountered in valuing the bankruptcy estate's assets because the firm received incorrect, or perhaps aspirational, values from the Debtor.

The Trustee objected to L&T's Fee Application on the basis that the firm created problems for the administration of the case by failing to timely file, or adequately identify issues in connection with employment applications for professionals. The Trustee's concerns are only a part of the many problems caused by L&T's errors and missteps. Notwithstanding that the monthly operating reports were delayed, and when filed, a mess, L&T did not initially seek retention of an accountant, and the first two attempts were retention applications filled with misleading, incomplete, or false information. L&T also set in motion a rush to file a plan[19] but failed to take all other steps necessary to make the plan and disclosure statement process workable, including failing to file objections to the many proofs of claim that the Debtor argued should be stricken. When L&T finally filed its plan and disclosure statement, not only were the documents woefully deficient, but several provisions of the plan were clearly not authorized by the applicable provisions of Chapter 11 of the Bankruptcy Code. Further, L&T did nothing to formally request that the UST conclude the Debtor's section 341 meeting, resulting in an open-ended deadline for creditors

---

[19] L&T lamented the compressed timeframe in which it had to file a disclosure statement and plan. The Court notes here, as it did on the record, that the rushed timing was solely due to L&T's unsolicited promise to file a plan and disclosure statement in thirty days to counter the rising crescendo of objections, including a motion to dismiss filed by one creditor, raised to the many filing deficiencies in the case.

to object to the Debtor's discharge. Fortunately for the Debtor, the Trustee negotiated releases on her behalf as part of the global settlement.

L&T was clearly not competent to represent a chapter 11 debtor in a case of this type; the firm obviously was in over its head, and until Mr. Fender came in as a member of the L&T team, the case was rushing towards conversion. However, L&T did do some work that benefitted the estate - (i) the firm worked out initial issues of the Debtor's case, including preparation of schedules (which had to be redone several times, including once after the Court granted a motion to compel); (ii) ensured that the Debtor retained property insurance; (iii) attended the 341 meeting with the Debtor; and (iv) defended, and ultimately resolved,  a Motion to Dismiss filed by Fulton Bank.

While the Court has previously awarded L&T fees on an interim basis, "all awards of interim compensation are tentative, hence reviewable—and revisable— at the end of the case." *In re Taxman Clothing Co.,* 49 F.3d 310, 314 (7th Cir.1995). L&T seeks a total of $222,222.50 in fees and $529.16 in expenses. The Court has determined it is appropriate to reduce the fees by $38,195. These reductions are due to the Court's disallowance of fees relating to the initial draft of the plan and disclosure statement (before Mr. Fender's intervention) which documents were completely deficient, and, but for the appearance of Mr. Fender, would have caused immediate conversion of the case; disallowance of all fees relating to the Monthly Operating Reports before Ms. Sorvik, as those MORs were completely useless, charging for secretarial time (a major problem) and unidentified (no detail at all) or unauthorized (attendance at Windmill hearings)

time charges L&T has previously been awarded, and paid, $44,470.84 in fees and $529.16 in expenses, plus the $90,750.00 on account of the work done by Mr. Fender. The Court finds that the total remaining amount of fees that should be awarded to L&T is $48,806.66.

**The Crabtree Fee Application**

Crabtree & Auslander, L.L.C. ("Crabtree") seeks approval of payment of $35,000.00 in fees for its post-petition work on the Appeal. Prepetition the Debtor had engaged Crabtree for a flat fee of $75,000.00. The Debtor paid Crabtree a total of $40,000.00 in June of 2016. The Debtor paid Crabtree the remaining $35,000.00 post-petition and without court authority. Crabtree has maintained those funds in its trust account. Crabtree seeks the award and disbursement of the outstanding balance of $35,000.00 of the pre-petition flat fee agreement. Crabtree argues the Court should review the reasonableness of the flat fee arrangement in accordance with 11 U.S.C. §328(a)[20], which is the Bankruptcy Code section under which contingency fee arrangements are authorized, rather than consider the reasonableness of the hourly rates and time detail in accordance with the criteria of section 330(a)(3).

The Crabtree Employment Application sought approval to employ Crabtree

---

[20] The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.  11 U.S.C. 328(a).

under a general retainer pursuant to section 330 and provided that "Crabtree & Auslander will apply for compensation and reimbursement of costs, pursuant to Sections 330 and 331 of the Bankruptcy Code, at its ordinary rates…". Crabtree Employment Application, para. 7. The Court entered the Crabtree Retention Order which approved the employment under the terms described in the Crabtree Employment Application.

According to Crabtree, notwithstanding language in the Crabtree Employment Application to the contrary, (i) the attachment to the Crabtree Employment Application (a copy of the flat fee agreement) put all parties on notice that Crabtree's fees were based on a flat fee arrangement; (ii) the Crabtree fees should have been approved under section 328; and (iii) Crabtree did not understand the bankruptcy retention process enough to understand that the Crabtree Retention Order approved something other than the flat fee arrangement. Crabtree argues that the lack of section 328 approval in the Crabtree Retention Order regarding the flat fee arrangement was a mistake and that the order should be amended pursuant to Fed.R.Civ.P. 60(b)[21].

There was no mistake; the record from the hearing on Crabtree's Employment Application is clear. Addressing the $35,000 postpetition unauthorized "retainer", the UST stated, "I believe [Crabtree] do[es] want a postpetition retainer, and we understand that there is money that came into the estate to fund that, and we also understand that there is a prepetition claim. However, **since counsel is being retained under 327(e), we don't believe that**

---

[21] Fed.R.Civ.P. 60 is applicable to bankruptcy proceedings pursuant to Fed.R.Bankr.P. 9024.

**there's a problem, so we have no objection**." Hearing Transcript, January 16, 2018, p. 9, lines 15-20, ECF #215 (emphasis added). Neither the Debtor's counsel nor any representative from Crabtree responded to, or sought to correct, the UST's comments. Thus, the Court will consider the Crabtree Application applying the standards of section 330(a).

The Trustee argues that the Appeal did not benefit the bankruptcy estate because the Appeal only impacted the distribution between to two priority creditors in the Probate Case. Because the Probate Estate does not have enough funds to distribute anything to the bankruptcy estate (which now holds the Debtor's residuary interest in the Probate Estate), the treatment of the priority claims in the Probate Estate was and is irrelevant to the bankruptcy case[22].

Crabtree counters that the firm's services were beneficial because, if the Appeal had been successful, the probate court's *approval* of the settlement between the Curator and PBGC would have been undone. Undoing the probate court approval, though it would not undo the actual settlement, could have exposed the Curator to personal liability to the Debtor. According to Crabtree, the hypothetical exposure of the Curator could theoretically offset the Curator's claims for defalcation against the PR bond in the F&D Litigation. F&D argues that there was no possible benefit to the bankruptcy estate because, other than the indemnity claim by F&D, there were no claims against the Debtor in the F&D

---

[22] Despite the Debtor's continued arguments to the contrary, because the Probate Estate is insolvent, the bankruptcy estate will not receive any distributions that would potentially benefit the Debtor's creditors.

Litigation. The Curator asserted claims against the PR bond for the Debtor's alleged defalcation, but not against the Debtor *personally*. Thus, there was never a possibility for setoff, according to F&D.

Whether services rendered to a bankruptcy estate provided a benefit is not the sole or controlling factor in awarding fees under section 330. Moreover, a court should not review the benefit solely in hindsight. "[T]he Court must conduct an objective inquiry, 'based upon what services a reasonable lawyer or legal firm would have performed in the same circumstances.' The focus is on what a reasonable lawyer would have done at the time; the Court should not invoke perfect hindsight." *In re Cenargo Intern., PLC*, 294 B.R. 571, 595 (Bankr.S.D.N.Y. 2003) (internal citations omitted).

The bankruptcy estate formally retained Crabtree approximately one week before scheduled oral arguments in the Appeal before the Florida Third District Court of Appeal. At the time of Crabtree's retention, all parties in interest believed the retention was necessary to preserve the rights of the bankruptcy estate; no one objected to Crabtree's retention for that purpose. The UST stated "this is a very important hearing coming up next week and counsel has been on the case from day one. So they -- they know the case, they're the best person to continue with the case and safeguard the estate's position and interest next week with regards to the hearing." Hearing Transcript, January 16, 2018, p. 9, lines 9-14 (ECF #215). Therefore, the Court finds that it was reasonable at the time to retain Crabtree to finish prosecution of the Appeal, and the objections on this ground are overruled.

The Court does not have expertise in the reasonableness of state court appellate fees. However, no one objected to the reasonableness of Crabtree's fees. Indeed, in his objection the Trustee wrote that he "does not challenge the number of hours expended on the services provided, the rates charged by the applicants, the timeliness of the services rendered, or the skill and experience of any of the professionals involved in these matters. Trustee Tabas also does not challenge the manner in which the time was kept and presented". (ECF #747, n. 5). Accordingly, rather than require the parties to expend time and expense on retaining experts, the Court will award $35,000.00 since support was provided for an amount slightly in excess of $35,000.00.

## Order

It is ORDERED and ADJUDGED:

1.     The Trustee is directed to pay the amounts authorized in this Order with respect to all Fee Applications other than Udell.

2.      The Trustee is directed to issue a notice of filing of attorneys' fees relating to the Castellano Suit and Bar Order within 14 days of the entry of this Order.

3.     Udell will have seven days to file an objection to the Trustee's fees; if no objection is filed, the Trustee is authorized to pay Udell the amount awarded herein less the fees sought in the notice of filing.

4.     If Udell files an objection, the Trustee shall contact the Court and advise that there is a dispute and the Court will determine whether and to what extent the fees sought by the Trustee are reasonable and should be

charged against the Udell fee award.

### 

Copies furnished to:
Drew Dillworth, Esq.
    *Attorney Dillworth shall serve a copy of this Order on all interested parties and file a certificate of service.*